IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 2, 2010

**STATE OF TENNESSEE v. COURTNEY HUNT-GUY,
a/k/a COURTNEY HUNT**

**Appeal from the Criminal Court for Shelby County**
**No. 07-05504     Chris Craft, Judge**

**No. W2009-00978-CCA-R3-CD  - Filed July 22, 2010**

The Defendant, Courtney Hunt-Guy, was convicted by a Shelby County Criminal Court jury
of theft of property valued at $1000 or more but less than $10,000, a Class D felony, and
evading arrest and vandalism of property valued at $500 or less, both Class A misdemeanors,
and was sentenced by the trial court as a Range I offender to an effective term of three years,
six months in the county workhouse.  On appeal, the Defendant contends that the evidence
is insufficient to sustain his convictions and that the trial court imposed an excessive sentence
by not applying the mental health mitigating factor to his felony theft conviction.  We affirm
the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JOHN EVERETT
WILLIAMS and ALAN E. GLENN, JJ., joined.

Robert Wilson Jones, District Public Defender; Phyllis L. Aluko (on appeal) and Jennifer
Case (at trial), Assistant Public Defenders, for the appellant, Courtney Hunt-Guy, a/k/a
Courtney Hunt.

Robert H. Cooper, Jr., Attorney General and Reporter; Mark E. Davidson, Senior Counsel;
William L. Gibbons, District Attorney General; and Stacy M. McEndree, Assistant District
Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case relates to a 1985 white Ford Bronco, flight from police, and vandalism of

the squad car in which the Defendant was placed following his arrest. At the trial, Jennice Peters, a clerical specialist at the Shelby County Clerk's Office, testified that the Ford Bronco was registered to Bryan K. Hallum. Bryan Hallum testified that on October 1, 2006, he lent his Ford Bronco, worth approximately $2500, to his father, Billy Hallum, who was in town for business and staying at a hotel. He said that the next day, his father called him and informed him that the Ford Bronco had been stolen. He drove his wife's vehicle to an Amoco service station on South Third Street, where he met his father and provided the tag number of the Bronco to the police officers who had already responded to the scene.

Hallum testified that approximately two weeks later, he received a call informing him that the police had found his Bronco. He went to the impound lot to pick it up and discovered that the front bumper had been bent, the driver's door had been damaged, the stereo had been ripped out of the dash leaving loose wires exposed, and some of the inside trim had been torn. He said that several of his personal items, including his hunting boots and binoculars, were missing from the vehicle while other items that did not belong to him were strewn inside, including two suitcases, jeans, jackets, and paperwork. He stated that the steering column was not broken and that the keys were in the ignition. He said that the ripped-out stereo was in the back, but it had been destroyed and no longer worked. He stated that the repairs to the Bronco cost $1500 for the body work alone.

Hallum testified that he did not know the Defendant and did not give him permission to use his Bronco. On cross-examination, he acknowledged that he was not "there to see whether" his father gave anyone permission to use the vehicle. He further acknowledged that he had no idea how many times the vehicle might have changed hands between the time it left his father's possession and the time he recovered it. On redirect examination, he testified that his father was seventy-six years old and lived in Florida, that their plan had been for his father to give him a ride to his office on October 2, 2006, and to use the vehicle all day while he was at work, and that his father was "very upset" when he met him that morning at the Amoco station.

Memphis Police Officer Steven Easterwood testified that on October 2, 2006, he responded to the Amoco station on South Third Street, where he took a theft report and broadcasted the information to his dispatcher. He said that he received information for the report initially from Billy Hallum, a white male approximately 75 to 80 years old, and then later from both Billy and Bryan Hallum. He stated that he waited at the service station until Bryan Hallum arrived because the elder Hallum did not have a ride, and he was concerned for his safety.

Memphis Police Officer Langdon Hubbert testified that on October 17, 2006, he was assigned to uniform patrol and was stopped at the light at McLemore Avenue and Florida

Street when a white Ford Bronco matching the description of a vehicle his partner had mentioned at roll call passed in front of him. He stated that when he turned behind the vehicle to check its tag number, the driver, later identified as the Defendant, accelerated rapidly and turned eastbound off Florida Street. He said he caught up with the vehicle after it had turned southbound on Main Street, where he was able to run its tag number through dispatch. He testified that he had not activated his lights and was within fifteen feet of the still-moving vehicle, which by this time "had turned back westbound on Trigg from Horace," when the doors came open and both the Defendant and the male passenger jumped out and fled on foot.

Officer Hubbert testified that he watched the Bronco strike a fence and come to rest and that he then turned onto Main Street, where he saw the Defendant emerge from a backyard and continue southbound. He stated that he called for additional officers to respond, left his vehicle, and ordered the Defendant to stop. He said the Defendant kept running, cutting eastbound through some woods toward the next street over. He stated that he lost sight of the Defendant while chasing him in the woods but that when he emerged on the next street, he saw the Defendant standing at the front corner of a house. He testified that he again gave the Defendant "verbal commands," and the Defendant started running again, heading eastbound toward the backyard of the house and jumping a couple of fences in his flight.

Officer Hubbert testified that he heard another officer say that he had the Defendant in the 1300 block of Michigan Street, went to that location, and saw the handcuffed Defendant sitting on the ground in a junkyard. He said that after he and other officers had placed the Defendant in the back seat of a squad car, using the left rear door, the Defendant made his way across the seat to the right side and "head butted" the right rear window, shattering the glass. He stated that the vehicle belonged to the City of Memphis and that he did not know the cost of repair.

On cross-examination, Officer Hubbert acknowledged that he did not activate either his blue lights or his siren when following the Bronco, that the vehicle's passenger was never captured, and that he later learned that the Defendant's driver's license was suspended. He further acknowledged that the Defendant was "pretty upset," "struggled," and "thrashed around wildly," as the officers attempted to take him into custody and was "still struggling," although he had "started to calm down a little bit," when they placed him in the back seat of the squad car. He testified that he did not see the Defendant get sprayed with pepper spray.

Memphis Police Officer Keyon Love, one of the uniformed officers who responded to Officer Hubbert's call for assistance, testified that he was checking the area when he noticed the Defendant, who matched the description of one of the suspects, walking in the

backyard of a house. He said that the Defendant ran when the Defendant saw him and that he chased the Defendant. He stated that the Defendant jumped a fence into a junkyard and that he jumped the fence and apprehended the Defendant. He testified that he radioed his location to other officers, who picked up the Defendant, took him back over the fence, and escorted him to a nearby squad car. He said that one of the other officers recovered a screwdriver from the Defendant when he patted him down.

On cross-examination, Officer Love acknowledged that the Defendant "resisted somewhat" when taken into custody and that it took several officers to get him back over the fence. He stated, however, that he would not characterize the Defendant as "struggling" during the time the Defendant escorted to the squad car. He said he did not see the Defendant get sprayed by pepper spray and did not recall the Defendant's crying.

Memphis Police Officer Michael Staten completed the accident report on the wrecked Ford Bronco. He identified the vehicle by its vehicle identification number and tag number.

The Defendant elected not to testify and presented no witnesses in his defense. The jury convicted him of the indicted offenses, and the trial court sentenced him to concurrent terms of three years, six months for the felony theft conviction and eleven months for each of the misdemeanor convictions, for an effective term of three years, six months. This appeal followed.

## I. SUFFICIENCY OF THE EVIDENCE

The Defendant first contends that the evidence is insufficient to sustain his convictions. Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence, but we must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

### A. Theft over $1000

In order to convict the Defendant of theft over $1000, the State had to prove beyond a reasonable doubt that the Defendant, with the intent to deprive Bryan Hallum of his Ford Bronco, knowingly obtained or exercised control over the Bronco without Hallum's effective

-4-

consent and that the value of the vehicle was $1000 or more but less than $10,000. See T.C.A. §§ 39-14-103, -105(3) (2006).

The Defendant argues that the State failed to prove beyond a reasonable doubt that he knowingly exercised control of the vehicle without the owner's effective consent or that he intended to deprive the owner of the vehicle. He asserts that without the testimony of Hallum's father about the circumstances under which the vehicle left his possession, "the jury was left to speculate whether the vehicle was stolen or whether [Hallum's father] gave, rented, or sold it to someone." He further asserts that "it is quite possible that [the vehicle] changed hands more than once," especially given the two weeks that elapsed between the time the vehicle was reported missing and the Defendant's arrest, and thus, "[i]t is impossible to say with any degree of moral certainty" that the Defendant knew, at the time he exercised control of the vehicle, that he did not have the owner's effective consent to do so. The State responds by arguing that the jury could properly infer the Defendant's intent to deprive the owner of his property from the surrounding facts and circumstances.

We conclude that the evidence, viewed in the light most favorable to the State, is sufficient to establish beyond a reasonable doubt that the Defendant knowingly exercised control over the Bronco without the owner's consent and with the intent to deprive the owner of his property. Criminal intent may be inferred from the circumstances of the conduct or context in which the offense occurs. State v. Inlow, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000). The State presented evidence that Bryan Hallum lent the vehicle to his father with the understanding that his father would take him to his office the next morning, that his father called him the next day from a service station on South Third Street instead of picking him up for work, and that he responded to his father's telephone call by driving to the service station, where he found the vehicle gone and police officers with his father, who was "very upset." The State presented further evidence to show the Defendant accelerated from a uniformed patrol officer who was attempting to run the Bronco's tag number and then jumped from the still-moving vehicle, leaving it to crash into a fence, while he fled from the officer on foot. Finally, the State presented evidence to show that the Bronco was severely damaged, with the stereo removed and inside trim torn, at the time it was recovered from the Defendant. From all this evidence, a rational jury could reasonably find that the Defendant knowingly exercised control over the Bronco without Bryan Hallum's effective consent and with the intent to deprive Hallum of his property. The evidence, therefore, is sufficient to sustain the Defendant's felony theft conviction.

## B. Evading Arrest

In order to convict the Defendant of misdemeanor evading arrest, the State had to prove beyond a reasonable doubt that the Defendant fled from someone he knew to be a law

enforcement officer with the knowledge that the officer was attempting to arrest him. See T.C.A. § 39-16-603(a)(1)(A) (2006).

The Defendant argues that the State failed to prove beyond a reasonable doubt that he knew that the officers were attempting to arrest him at the time that he ran from them. He points out that there was no evidence that the officers informed him that they wanted to arrest, rather than merely question, him and asserts that it is likely he ran because he was driving on a suspended license. He also cites State v. Vincent Conner, No. M2005-00887-CCA-R3-CD, Maury County (Tenn. Crim. App. Aug. 23, 2006), app. denied (Tenn. Dec. 27, 2006), for the proposition that "[a] chase accompanied solely by verbal commands to stop is insufficient by itself to establish that a fleeing person knows that the officer is attempting to arrest him at the time that the person flees." The State counters that Vincent Conner is distinguishable on its facts because the officers there, unlike in this case, did not witness the defendant "engage in any unlawful activity that would have supported an arrest when they first approached the Defendant." Id., slip op. at 8.

We conclude that the evidence presented at the trial is sufficient to establish beyond a reasonable doubt that the Defendant knew the officers were trying to arrest him at the time of his flight. Viewed in the light most favorable to the State, the evidence showed that the Defendant was driving a stolen vehicle, accelerated from a uniformed police officer in a marked patrol car who pulled behind the vehicle to get its tag number, turned down several side streets, and jumped from the still-moving vehicle and fled on foot, despite the officer's repeated commands for him to stop. We agree with the State that these facts, which provided the officers with probable cause to arrest the Defendant, distinguish this case from Vincent Conner. In that case, this court concluded that the evidence was insufficient to sustain a conviction for evading arrest when the proof showed that officers approached the defendant not to arrest him but to serve him with papers, the defendant was not engaged in any obvious illegal activity at the time that he fled, and the officers never announced that they were attempting to arrest him. Id. The evidence, therefore, is sufficient to sustain the Defendant's conviction for evading arrest.

## C. Vandalism

In order to convict the Defendant of vandalism of property valued at $500 or less, the State had to prove beyond a reasonable doubt that the Defendant knowingly damaged or destroyed the property of the City of Memphis, which was valued at $500 or less, knowing that he did not have the owner's effective consent. See T.C.A. §§ 39-14-408(a), -105(1) (2006).

The Defendant argues that the evidence failed to establish either the value of the

damage to the vehicle's window or that he knowingly shattered it. In support of the latter contention, he cites Officer Hubbert's acknowledgment that the Defendant "struggled" and "thrashed" as the officers were taking him into custody.

We conclude that the evidence presented at trial is sufficient to establish that the Defendant knowingly shattered the rear window of the squad car, which had a value of $500 or less. According to Officer Hubbert, the Defendant had calmed down somewhat by the time he was placed in the backseat of the squad car and made his way across the seat to the right side of the vehicle and "head butted" the window. Neither Officer Hubbert nor Officer Love saw the Defendant get sprayed with pepper spray. Thus, a rational jury could reasonably find beyond a reasonable doubt that the window damage occurred as the result of the Defendant's knowing action rather than in the midst of any wild, uncontrollable thrashing. Moreover, although no one testified about the value of the window, a rational jury could reasonably conclude that a window on a motor vehicle would be valued at $500 or less. The evidence, therefore, is sufficient to sustain the Defendant's vandalism conviction.

## II. SENTENCING

The Defendant contends that the trial court imposed an excessive sentence for his theft conviction by not applying mitigating factor (8), that he was suffering from a mental condition that significantly reduced his culpability for the offense. See T.C.A. § 40-35-113(8) (2006). He argues that the trial court erroneously found that he was not under stress at the time of the theft because "the record failed to establish the circumstances by which the [D]efendant obtained possession or exercised control of the vehicle." The State responds that the trial court properly declined to apply the mental health mitigating factor to the theft conviction because there was no evidence that the Defendant was under stress during the theft of the vehicle.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d), -402(d) (2006). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the

sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994); see T.C.A. § 40-35-210(e) (2006).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210 (2006); see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

In imposing a specific sentence within the appropriate range of punishment for the defendant:

> [T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c).

Exhibits introduced at the sentencing hearing included the Defendant's presentence report, copies of his juvenile record, the transcript of his competency hearing, and various mental health records. The latter showed that the Defendant had a long history of violence, which included torturing and killing animals, choking his sister, pointing a BB gun at his stepfather, destroying property, and self-mutilating behavior. They also showed that the Defendant had been diagnosed with various conditions, including depression disorder, adolescent onset conduct disorder, antisocial personality disorder, and "stress secondary to environment."

At the conclusion of the sentencing hearing, the trial court found three enhancement factors applicable to the offenses: (1) that the Defendant had a history of criminal convictions or behavior in addition to those necessary to establish his range; (8) that the Defendant had failed to comply with the conditions of a sentence involving release into the community, a factor to which the court assigned "a good amount of weight"; and (16) that the Defendant had been adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult. See T.C.A. § 40-35-114(1), (8), (16) (2006). The trial court found as a mitigating factor that the Defendant's criminal conduct neither caused nor threatened serious bodily injury, see T.C.A. § 40-35-113(1) (2006), but declined to give it much weight. The trial court also found that mitigating factor (8), "[t]he defendant was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense," see id. § 40-35-113(8), applied to the Defendant's misdemeanor convictions but was entitled to little weight, based on the psychological reports indicating that the Defendant tended to lose control of himself when stressed. The trial court declined to apply this mitigating factor to the Defendant's theft conviction, however, finding that there was no evidence that the Defendant was under stress at the time he was first seen driving the SUV.

We conclude that the trial court did not err by not applying the mental health mitigating factor to the Defendant's felony theft conviction. As the State notes, there was no evidence in the record that the Defendant was acting under stress at the time of the offense. Accordingly, we affirm the sentencing determinations of the trial court.

## CONCLUSION

Based on the foregoing and the record as a whole, we conclude that the evidence is sufficient to sustain the Defendant's convictions and that the Defendant's sentence is appropriate. We affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE